MULLINS, J.
**486 *392 The plaintiff, Walgreen Eastern Company, Inc., appeals from the judgment of the trial court denying, in part, its appeal from the decision of the Board of Assessment Appeals (board) of the defendant, the town of West Hartford (town). The trial court concluded that the plaintiff had established aggrievement under General Statutes § 12-117a[1] because the town **487 overvalued its property. The court then found a new valuation for the subject property and ordered the town to provide the plaintiff with the appropriate reimbursement or credit for any overpayment plus interest. In addition, the trial court also determined that the town's assessment was not manifestly excessive under General Statutes § 12-119.[2]
In the present appeal, the plaintiff claims that, although the trial court correctly determined that the plaintiff had established aggrievement by showing that the town's valuation of the property was excessive, it incorrectly (1) determined the true and actual value of the subject property, and (2) concluded that the town's valuation of the subject property was not manifestly excessive. We disagree and, accordingly, *393 affirm the judgment of the trial court.
The following relevant facts and procedural history are set forth in the trial court's memorandum of decision. "The subject property is a 1.45 acre improved parcel located [at] 940 South Quaker Lane in the town. The property abuts another parcel to the south, with which it was once merged, near the intersection of South Quaker Lane, which is to the west, and New Britain Avenue, which is to the south, in the Elmwood section of the town.
**488 "The improvement on the subject property is a 12,805 square foot building originally constructed in 1949 as a movie theater. In 2003, a developer, Nixon Plainville, LLC, purchased the subject property and the adjoining property to the south for $2,500,000, formally subdivided them, and began to convert the building on the subject property into a Walgreens pharmacy. In appraisal terms, the property was of the 'build to suit' type.
"The developer entered into a 'triple net' or 'NNN' lease with the plaintiff under which the plaintiff was responsible for the payment of all insurance, maintenance, and property tax expenses. The lease commenced in December, 2004, but the pharmacy did not open until 2006. The lease runs for seventy-five years, but the plaintiff can terminate it after twenty-five years and every five years thereafter. The rent is fixed at $430,000 per year for the term of the lease plus a small percentage of the gross sales. This rate converts to $33.58 per square foot.
"In 2006, the developer sold the subject property to Maple West Hartford, LLC, which has been described as an investor, for $6,718,750. There have been no further sales of the property.
"The pharmacy now has parking space for approximately [seventy-five] cars. Some of the parking space is shared with Webster Bank, which occupies the property to the south. There is no drive-up service window for the pharmacy. Although the pharmacy is not on the exact corner of South Quaker Lane and New Britain Avenue, it is near the corner. There is a full, two-way auto[mobile] access from and to South Quaker Lane. From New Britain Avenue, cars going westbound can make a right turn into a driveway, marked by a Walgreens sign, that goes behind the bank on the corner and into the [plaintiff's] parking lot.
**489 "The pharmacy is visible from the road from all directions except westbound. The westbound view from New Britain Avenue is blocked by the bank and a tree. The intersection of South Quaker Lane and New Britain Avenue has high traffic volume and has a traffic light."
In accordance with the town's statutory obligation; see General Statutes § 12-62 (b) (1) ;[3] the assessor conducted a town wide revaluation of all real estate for the grand list of October 1, 2011, and determined that the subject property had a fair market value of $5,020,000 and an assessment *394 value of $3,514,000. The plaintiff challenged the valuation and appealed to the board pursuant to General Statutes § 12-111 (a). The board upheld the assessor's valuation, and the plaintiff appealed to the Superior Court pursuant to §§ 12-117a and 12-119.
In its appeal to the Superior Court, the plaintiff's complaint contained two separate counts. In count one, the plaintiff alleged, pursuant to § 12-117a, that it was aggrieved by the actions of the board because the assessor's valuation of the property exceeded 70 percent of its true and actual value on the assessment date. In count two, the plaintiff alleged, pursuant to § 12-119, that the valuation was "manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of the property." The plaintiff thus sought a reduction **490 in the amount of the tax and the valuation on which it had been based.
At trial, the plaintiff presented the testimony of two appraisers, Anthony Barna and Richard Michaud, who both valued the property at $3 million. The town presented the testimony of two appraisers: John Leary, who performed the revaluation for the town, and Christopher Kerin, who valued the property at $4,900,000. The trial court credited Kerin's testimony and determined that the true and actual value of the property was $4,900,000.[4] As a result, the court concluded that the assessor had overvalued the property by assigning it a true and actual value of $5,020,000. Accordingly, because the true and actual value was less than the value assigned by the assessor, the court found that the plaintiff had satisfied its burden of proving **491 aggrievement, and, therefore, the court found in favor of the plaintiff on count one. Addressing count two, the trial court found that the plaintiff had not met its burden of establishing that the assessment was manifestly excessive under § 12-119. The court then rendered judgment in favor of the plaintiff on its § 12-117a count and in favor of the town on the plaintiff's § 12-119 count. The plaintiff appealed.[5] *395 I
In its appeal from the § 12-117a count, the plaintiff claims that, although the trial court correctly concluded that it had established aggrievement by proving that the assessor had overvalued its property, the relief awarded was insufficient because the trial court improperly determined the true and actual value of the subject property. Specifically, the plaintiff alleges that the trial court improperly (1) applied General Statutes § 12-63b (b), (2) valued the leased fee interest, rather than the fee simple interest, and (3) selected too narrow a highest and best use for the property.[6] We disagree.
We begin with the principles governing municipal tax appeals. " Section 12-117a, which allows taxpayers to appeal the decisions of municipal boards of [assessment appeals] to the Superior Court, provide[s] a method by which an owner of property may directly call in question the valuation placed by assessors upon his property.
**492 ... In a § 12-117a appeal, the trial court performs a two step function. The burden, in the first instance, is upon the plaintiff to show that he has, in fact, been aggrieved by the action of the board in that his property has been overassessed.... In this regard, [m]ere overvaluation is sufficient to justify redress under [ § 12-117a ], and the court is not limited to a review of whether an assessment has been unreasonable or discriminatory or has resulted in substantial overvaluation.... Whether a property has been overvalued for tax assessment purposes is a question of fact for the trier.... The trier arrives at his own conclusions as to the value of land by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value including his own view of the property....
"Only after the court determines that the taxpayer has met his burden of proving that the assessor's valuation was excessive and that the refusal of the board of [assessment appeals] to alter the assessment was improper, however, may the court then proceed to the second step in a § 12-117a appeal and exercise its equitable power to grant such relief as to justice and equity appertains .... If a taxpayer is found to be aggrieved by the decision of the board of [assessment appeals], the court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the applicant's property." (Citations omitted; internal quotation marks omitted.) Konover v. West Hartford , 242 Conn. 727, 734-35, 699 A.2d 158 (1997).
In the present case, the trial court found that the plaintiff met its burden of proving that the assessor's valuation was excessive and that the board's refusal to alter the assessment was improper. The court then proceeded to the second step in the § 12-117a claim, namely, determining the appropriate relief based on the **493 true and actual value of the applicant's property. The plaintiff now challenges the trial court's judgment on the ground that the *396 trial court's finding regarding the true and actual value of the subject property was excessive.
"In a tax appeal taken from the trial court to the Appellate Court or to this court, the question of overvaluation usually is a factual one subject to the clearly erroneous standard of review.... Under this deferential standard, [w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported.... Additionally, [i]t is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.... The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible.... On appeal, we do not retry the facts or pass on the credibility of witnesses.... Simply put, a trial court is afforded wide discretion in making factual findings and may properly render judgment for a town based solely upon its finding that the method of valuation espoused by a taxpayer's appraiser is unpersuasive....
"Conversely, we review de novo a trial court's decision of law. [W]hen a tax appeal ... raises a claim that challenges the propriety of a particular appraisal method in light of a generally applicable rule of law, our review of the trial court's determination whether to apply the rule is plenary.... To be sure, if the trial court rejects a method of appraisal because it determined that the appraiser's calculations were incorrect **494 or based on a flawed formula in that case, or because it determined that an appraisal method was inappropriate for the particular piece of property, that decision is reviewed under the abuse of discretion standard.... Only when the trial court rejects a method of appraisal as a matter of law will we exercise plenary review....
"Thus, the starting point in any tax appeal taken from the Superior Court, including the present appeal, is a determination as to whether the trial court reached its decision through (1) the exercise of its discretion in crediting evidence and expert witness testimony, or (2) as a matter of law." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) Redding Life Care, LLC v. Redding , 308 Conn. 87, 100-102, 61 A.3d 461 (2013).
A
The plaintiff first claims that the trial court did not properly apply § 12-63b (b)[7] in valuing the subject property because the court considered the actual rental income under the lease (contract rent) in calculating the true and actual value of the property. Specifically, the plaintiff argues that the trial court improperly rejected the appraisals submitted by the plaintiff's appraisers because they did not include consideration of the contract rent. The plaintiff asserts that the language of § 12-63b (b) does not mandate that the assessor consider contract rents, and that contract rent in the present case was not relevant to establish the true and actual value of the subject property in 2011 because the lease had been negotiated in 2003. Furthermore, the plaintiff asserts that the trial court's reliance on *397 First Bethel Associates v. Bethel , 231 Conn. 731, 651 A.2d 1279 (1995), is misplaced because the holding of First Bethel Associates subsequently was modified or **495 overturned. We reject the plaintiff's claim regarding the application of § 12-63b (b).
"[W]hen a tax appeal, like the present one, raises a claim that challenges the propriety of a particular appraisal method in light of a generally applicable rule of law, our review of the trial court's determination whether to apply the rule is plenary. See Sheridan v. Killingly , 278 Conn. 252, 260, 897 A.2d 90 (2006) (applying plenary review to claim that trial court improperly rejected assessor's attribution of value of leasehold interest to lessor's property); see also Torres v. Waterbury , 249 Conn. 110, 118, 733 A.2d 817 (1999) (legal conclusions in municipal tax appeal [are] subject to plenary review)." Breezy Knoll Assn., Inc. v. Morris , 286 Conn. 766, 776-77, 946 A.2d 215 (2008).
In the present case, the plaintiff challenges the trial court's decision to reject the appraisal method used by the plaintiff's experts and to adopt the appraisal method used by the town's expert. More specifically, the plaintiff's claim is that the trial court rejected the plaintiff's method of appraisal as a matter of law because the plaintiff's experts failed to consider both contract rent and market rent in the portion of their appraisals based on the income capitalization approach.[8] Accordingly, we conclude that our review of the trial court's decision is plenary.
**496 The following additional facts are necessary to resolve the plaintiff's claim. All three appraisers and the trial court used the income capitalization approach and the comparable sales approach to value the subject property. The trial court found that the two appraisals prepared by the plaintiff's experts did not consider the contract rent in their calculations based on the income capitalization approach to value the subject property pursuant to § 12-63b, whereas Kerin, the town's expert, did consider the contract rent.
The trial court explained as follows: "Barna and Michaud, the plaintiff's appraisers, determined that the market rent for comparable triple net retail properties, which included stores in in-line shopping centers, averaged $20 and $22 per square foot, respectively. They calculated the subject property's contractual rent at $33.58 per square foot. They declined to adjust the market rate for their analyses because the contract rate was above market.
"Kerin, looking at pharmacies only, found the average market rental rate to be $32.16 per square foot. Because the contract [rental] rate of $33.58 [per square foot] was similar, he used a rate of $32 per square foot for the income capitalization analysis."
The trial court then concluded: "The analysis of Barna and Michaud did not comply with the statutory command to 'consider the actual rental income ....'
*398 General Statutes § 12-63b (b)." The court explained: "The court cannot interpret this [statutory] phrase to be meaningless or superfluous.... Yet that is what Barna and Michaud have done. Their only 'consideration' of the actual rental income was to mention it in their reports. They automatically rejected further consideration of actual rental income because in their opinion it was above the market. They did not attempt to reconcile contract rents and market rents, as did **497 Kerin. Essentially, Barna and Michaud gave the contract rents no substantive consideration at all.... Accordingly, the court cannot accept their approach." (Citations omitted.)
General Statutes § 12-63 (a) provides in relevant part that, with certain enumerated exceptions not relevant to this appeal, "[t]he present true and actual value of ... property shall be deemed by all assessors and boards of assessment appeals to be the fair market value thereof and not its value at a forced or auction sale." Section 12-63b (a) specifies three different methods of calculation to produce a valuation of the true and actual value of the property: "(1) Replacement cost less depreciation, plus the market value of the land, (2) capitalization of net income based on market rent for similar property, and (3) a sales comparison approach based on current bona fide sales of comparable property...." Only the income capitalization approach is at issue in this appeal.
Section 12-63b (b) explains the meaning of "market rent" as it is used in the income capitalization approach. Specifically, § 12-63b (b) provides: "For purposes of subdivision (2) of subsection (a) of this section and, generally, in its use as a factor in any appraisal with respect to real property used primarily for the purpose of producing rental income, the term 'market rent' means the rental income that such property would most probably command on the open market as indicated by present rentals being paid for comparable space. In determining market rent the assessor shall consider the actual rental income applicable with respect to such real property under the terms of an existing contract of lease at the time of such determination ." (Emphasis added.)
Notwithstanding this statutory language, the plaintiff asserts that § 12-63b (b) does not require that contract **498 rents be considered by an appraiser. In particular, the plaintiff argues that if the contract is a long-term contract, as it is in this case, it does not reflect the current market rent for the property. We disagree.
In First Bethel Associates v. Bethel , supra, 231 Conn. at 731, 651 A.2d 1279, this court considered and rejected a claim similar to the one raised in the present appeal. In that case, the defendant, the town of Bethel, claimed that the assessor must consider contract rent, but only if it is equivalent to the market rent, whereas, the plaintiff, First Bethel Associates, claimed that the trial court should have considered contract rent only, and not market rent, in its determination of the market value utilizing the income capitalization approach. Id., at 737-38, 651 A.2d 1279.
This court rejected both of these contentions and, instead, concluded that "the statute requires that, in determining a property's 'market rent,' the assessor and, therefore, the court, in determining the fair market value of the property, must consider both (1) net rent for comparable properties, and (2) the net rent derived from any existing leases on the property. This legislative approach makes sense because it reflects the reality that a willing seller and a willing buyer-whose ultimate judgments are what we mean by 'fair market value'-would themselves consider in arriving at a price for the property that is *399 subject to leases that do not closely approximate current rentals for similar properties." (Emphasis in original; footnote omitted.) Id., at 740, 651 A.2d 1279.
This court further explained: "The town [of Bethel] argues that contract rent should not factor into the valuation process unless it is equivalent to the rent that the property would command on the open market. Such a construction, however, would mean that contract rent would factor into the analysis only if it had no effect on the overall valuation, rendering meaningless the direction of § 12-63b (b) to consider actual rental **499 income. Similarly, [First Bethel] Associates' argument that only contract rent should be considered ignores the statute's direction to take into account what the property would most probably command on the open market .... It is a well established rule of statutory construction that we will not read a statute in such a way as to render a portion of it superfluous.... Therefore, we reject the parties' proposed constructions because they each would render a portion of the statute mere surplusage." (Citations omitted; internal quotation marks omitted.) Id., at 740-41, 651 A.2d 1279 ; see also Sheridan v. Killingly , supra, 278 Conn. at 261-64, 897 A.2d 90 (recognizing that § 12-63b contemplates that actual rental income be included in income capitalization approach to valuation). Accordingly, we conclude that the trial court's conclusion that an appraisal method based on the income capitalization approach in the present case must consider both market and contract rent is in accordance with First Bethel Associates .
The plaintiff asserts, however, that this court subsequently has, sub silentio, overruled or modified its conclusion in First Bethel Associates , and, as result, the trial court in the present case incorrectly considered the contract rent of the subject property. In support of its claim, the plaintiff cites to PJM & Associates, LC v. Bridgeport , 292 Conn. 125, 971 A.2d 24 (2009), and J.E. Robert Co. v. Signature Properties, LLC , 320 Conn. 91, 128 A.3d 471 (2016). Specifically, the plaintiff asserts that, in PJM & Associates, LC , and J.E. Robert Co. , this court held that contract rent should be considered only if it is similar to market rent. We disagree and conclude that First Bethel Associates has not been modified or overruled by these cases and remains good law.
In PJM & Associates, LC , the parties did not raise, and this court did not consider, the question of whether contract rent should be considered when using the income capitalization approach to valuing property. The **500 question in PJM & Associates, LC , involved only whether actual rents and income from nonvaluation years should be considered under § 12-63b (b). See PJM & Associates, LC v. Bridgeport , 292 Conn. at 128-29, 971 A.2d 24. Indeed, this court's decision in that case cited to First Bethel Associates favorably for the proposition that " '[m]arket rent' under § 12-63b (b) thus is calculated by examining the '(1) net rent for comparable properties, and (2) the net rent derived from existing leases on the property.' " Id., at 140, 971 A.2d 24, quoting First Bethel Associates v. Bethel , supra, 231 Conn. at 740, 651 A.2d 1279.
Similarly, our review of J.E. Robert Co. also demonstrates that this court did not overrule or modify First Bethel Associates . In fact, J.E. Robert Co. does not even involve § 12-63b (b), but, rather, is an appeal from a foreclosure action. J.E. Robert Co. v. Signature Properties, LLC , supra, 320 Conn. at 93, 128 A.3d 471. In J.E. Robert Co., this court examined whether the trial court in a mortgage foreclosure action properly relied on an appraisal that valued the leased fee interest in a property, *400 instead of the fee simple interest. Id. Ultimately, this court concluded that it did not need to decide whether it was improper for the trial court to rely on an appraisal that valued the leased fee interest in the property because if contract rents are at market rates as they were in that case, the value of the leased fee and fee simple interests of mortgaged property is equivalent. Id., at 97, 128 A.3d 471. Not only did J.E. Robert Co. not overrule First Bethel Associates , but this court again cited First Bethel Associates approvingly. Id., at 99-100, 128 A.3d 471. Therefore, we are not persuaded that First Bethel Associates has been modified or overruled.
The plaintiff also asserts that the trial court was incorrect to consider contract rents in the present case because the lease under which these contract rents are due is a seventy-five year lease that was negotiated in 2003. The plaintiff claims that a long-term lease negotiated **501 eight years prior to the revaluation is irrelevant. We disagree. Neither the amount of time that has passed since the lease was negotiated nor the length of the lease is a factor contemplated in § 12-63b (b). To the contrary, § 12-63b (b) requires the consideration of "the actual rental income applicable with respect to such real property under the terms of an existing contract of lease at the time of such determination." In the present case, the trial court relied on an expert who considered the contract rent due under a lease that existed in 2011. The plaintiff does not claim that the lease was not in effect in 2011, or that the amount Kerin used as the contract rent was incorrect. Therefore, in considering contract rent, the trial court complied with § 12-63b (b).
In sum, the trial court correctly concluded that § 12-63b (b) requires that a valuation based on the income capitalization approach consider both contract rents and market rents. Accordingly, we conclude that the trial court correctly rejected the income capitalization analyses presented by the plaintiff's experts, who did not comply with § 12-63b (b).
B
The plaintiff also claims that the trial court improperly valued the leased fee interest in the subject property, rather than the fee simple interest. Specifically, the plaintiff asserts that the trial court "erred as a matter of law by incorrectly characterizing the 'fee simple' interest [by] conflating the definitions of 'fee simple' and 'leased fee.' " It contends that the trial court did not value the proper interest. The town asserts that the trial court did not value the leased fee interest of the subject property, but instead correctly applied the law to determine the "true and actual value" of the property. We agree with the town.
**502 We begin with the appropriate standard of review. As we have explained previously in this opinion, "when a tax appeal, like the present one, raises a claim that challenges the propriety of a particular appraisal method in light of a generally applicable rule of law, our review of the trial court's determination whether to apply the rule is plenary." Breezy Knoll Assn., Inc. v. Morris , supra, 286 Conn. at 776, 946 A.2d 215.
The trial court explained that "[t]he General Statutes do not specifically address the nature of the property interest that the town should assess, but instead only require an assessment of the 'true and actual value of real property ....' " The trial court further explained that "[b]oth parties to this case actually agree that the town should assess the fee simple interest in real property. They disagree, however, on the meaning of a fee simple interest." Ultimately, the trial court reasoned *401 that "what the town really seeks to tax is not the actual value of the lease in place but rather the capacity or potential of the real property to be leased. That characteristic is not contractual or transitory but rather inheres in the property." Thereafter, the trial court engaged in an analysis of § 12-63b (b), which we discussed in part I A of this opinion, and concluded that both contract rents and market rents must be considered to determine the true and actual value of the subject property.
The plaintiff does not clearly explain its claim that trial court improperly valued the leased fee interest. Nevertheless, after considering the plaintiff's brief in combination with its oral argument before this court, we construe the plaintiff's claim to be that the trial court's consideration of the actual rents when determining the true and actual value of the subject property led to an improper valuing of the leased fee interest, rather than the fee simple interest. We disagree.
**503 Before analyzing this claim, it is helpful to identify the distinctions between the fee simple interest, the leasehold interest and the leased fee interest. The Dictionary of Real Estate Appraisal defines "fee simple interest" as "[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat." Dictionary of Real Estate Appraisal (6th Ed. 2015) p. 90.[9] "Leasehold interest" is defined as "[t]he right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease." Id., p. 128. "Leased fee interest" is defined as "[t]he ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires." Id.
As we have explained previously in this opinion, General Statutes § 12-62a (b) requires the assessment to be based on the "true and actual value" of the plaintiff's property. The "true and actual value" is further defined as the "fair market value." General Statutes § 12-63 (a). As we explained in part I A of this opinion, § 12-63b (b) requires the consideration of both contract rents and market rents to determine the fair market value under the income capitalization approach.
The plaintiff's claim in the present case is similar to the issue addressed by this court in Sheridan v. Killingly , supra, 278 Conn. at 252, 897 A.2d 90. In Sheridan , the town of Killingly appealed from the judgment of the trial court, which had determined that its assessment was excessive because the valuation of the property using the income capitalization approach should not have considered **504 the value of the leasehold interest, but should have considered only the actual rental income. Id., at 254, 897 A.2d 90. This court reversed the judgment of the trial court. Id. We concluded that the trial court improperly ruled, as a matter of law, that the town of Killingly could not consider the value of the leasehold interest in its valuation of a leased property for tax assessment purposes. Id.
In doing so, this court explained that "we recognized in First Bethel Associates that § 12-63b clearly contemplated that an income capitalization analysis based solely *402 on actual rental income from a long-term lease might not reflect the true and actual value of the property for purposes of General Statutes § 12-64, if the actual rents did not reflect fair market value. In other words, we recognized that a leased property might have a fair market value that exceeds the capitalized value of the actual rental income and that excess value may be taken into account in assessing the true and actual value of the property for purposes of taxing the owner, even though the tenant receives the economic benefit of that excess value. In taking that excess value into account, the town [of Killingly] does not thereby tax the property owner for a property interest that belongs to the lessee. Rather, [it] uses the excess value as an indicator of the true and actual value of the owner's interest." (Emphasis in original; footnote omitted.) Id., at 262-63, 897 A.2d 90.
This court further explained that "if [a town] cannot assess a tax on the owner of leased property for the market value of the leasehold interest, it will be unable to tax the true and actual value of the property as required by General Statutes § 12-62a (b)." Id., at 263-64, 897 A.2d 90. This court concluded that "considering the value of the lessee's interest does not require the plaintiff to pay a tax on property that belongs to the lessee, but only to pay a tax on the true and actual value of his own property **505 as measured, in part, by the value of the lessee's interest."[10] (Emphasis omitted.) Id., at 265, 897 A.2d 90.
In the present case, as we explained in part I A of this opinion, the trial court correctly concluded that § 12-63b (b) requires that a valuation under the income capitalization approach must consider both contract and market rent. Therefore, the trial court's consideration of the value of the leasehold interest as one factor utilized to arrive at the true and actual value of the plaintiff's property is authorized and required by the statutory scheme. Furthermore, the trial court was able to consider the value of the leasehold interest in connection with the other substantial evidence regarding the true and actual value of the subject property. On the basis of all of the testimony and evidence presented at trial, the trial court determined the true and actual value of the subject property consistent with the statutory scheme.
Thus, on the basis of the foregoing, we conclude that the trial court properly considered the leasehold interest as one indicator of the true and actual value of the owner's interest in the subject property.
C
The plaintiff asserts that the trial court incorrectly selected too narrow a highest and best use of the subject property. In support of its claim, the plaintiff cites United Technologies Corp. v. East Windsor , 262 Conn. 11, 26 n.22, 807 A.2d 955 (2002), in which this court explained that "an extremely narrow highest and best **506 use conclusion might result in a very small or even nonexistent market, thereby eliminating the availability of market sales analysis as a useful valuation tool."[11] The *403 town responds that the trial court's determination that continuing as a retail pharmacy is the highest and best use of the subject property is not clearly erroneous based on the evidence presented at trial, and that United Technologies Corp. supports the trial court's determination. We agree with the town.
The following legal principles are relevant to our analysis. "A property's highest and best use is commonly accepted by real estate appraisers as the starting point for the analysis of its true and actual value.... [U]nder the general rule of property valuation, fair [market] value, of necessity, regardless of the method of valuation, takes into account the highest and best value **507 of the land.... A property's highest and best use is commonly defined as the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate .... The highest and best use determination is inextricably intertwined with the marketplace because fair market value is defined as the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use.... The highest and best use conclusion necessarily affects the rest of the valuation process because, as the major factor in determining the scope of the market for the property, it dictates which methods of valuation are applicable. Finally, a trier's determination of a property's highest and best use is a question of fact that we will not disturb unless it is clearly erroneous."[12] (Citations omitted; emphasis *404 in original; footnote omitted; internal quotation marks omitted.) United Technologies Corp. v. East Windsor , supra, 262 Conn. at 25-26, 807 A.2d 955.
"Under this deferential standard, [w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached.
**508 Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported.... A finding of fact is clearly erroneous when there is no evidence in the record to support it ... or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) Id., at 23, 807 A.2d 955.
At trial, the plaintiff's appraiser, the town's appraisers, and the court utilized substantially the same standard[13] for determining the highest and best use of the subject property as improved real estate. Kerin was of the opinion that "the highest and best use of the subject property as improved real estate is for continued present use of the subject property as a retail pharmacy." Kerin based that conclusion on the following: the fact that the property's improvements were designed and constructed to the plaintiff's specifications; the continued legal feasibility of the present use under West Hartford zoning laws; the continued physical feasibility of the present use because the subject improvements were in good condition; the continued financial feasibility of the present use; and the fact that their highest and best **509 use determination reflects that "[t]here is no alternative use to which the subject property could be put [that] would yield a higher present value indication."
By contrast, the plaintiff's appraisers, Michaud and Barna, reached a more generalized conclusion. Specifically, Michaud found that "[t]he highest and best use of the site as improved [real estate] is for continued retail/commercial use." In arriving at this more general conclusion, Michaud explained that "[g]iven the site's zoning, its physical characteristics, market conditions and the characteristics of the area, it appears the most productive use of the land is for retail or commercial development." Barna reached that same conclusion, stating that "the current use as a retail building represents the highest and best use of the property, as improved."
The town also introduced testimony and a report written by its expert, Leary, who had performed work for the town's revaluation of the subject property. The report contained "an analysis of the appropriate methodology for the valuation of national chain pharmacy property with particular *405 emphasis on valuation for ad valorem property assessment purposes in Connecticut." Also in his report, Leary explained that "the national chain pharmacy submarket is a subset of the [single tenant] building submarket in the retail market sector. This submarket has developed significantly since the turn of the century when the major national pharmacy chains began to leave tenant spaces in strip centers for [freestanding], preferably corner locations."
In its written memorandum of decision, the trial court explained that "the testimony and reports of Kerin and Leary ... identify the existence of a national chain pharmacy submarket, which is a subset of the single tenant building submarket in the retail market sector." The trial court then explained that property in this **510 submarket is marketable to investors because they can receive rental income; the properties support a single tenant with a triple net lease who "is willing to pay above market rents because its focus is on location, sales, and customer convenience rather than real estate costs and immediate profit." The trial court ultimately determined that, "[a]s a result of all of these factors, there is an active market for these properties.... Therefore, it is fully appropriate to consider the highest and best use of the subject property to be as a retail pharmacy."[14] (Citation omitted.)
Although this court expressed a concern in United Technologies Corp. v. East Windsor , supra, 262 Conn. at 26 n.22, 807 A.2d 955, that too narrow a highest and best use market might be problematic, a review of the entirety of this court's decision in that case supports the trial court's decision in the present case. In **511 United Technologies Corp. , the plaintiff property owner asserted, inter alia, that the trial court had arrived at an improperly restrictive conclusion regarding the highest and best use for the property. The trial court had concluded that "the highest and best use of the subject premises as improved would be ... its continued use as an industrial facility as presently used by [the plaintiff]." (Internal quotation marks omitted.) Id., at 25, 807 A.2d 955. This court affirmed the judgment of the trial court, explaining that "the trial court gave careful consideration to the expert testimony and reports, and its findings are amply supported in the record, its highest and best use determination is not clearly erroneous *406 and will therefore not be disturbed on appeal." Id., at 28, 807 A.2d 955.
In the present case, after the trial court carefully considered the testimony of four experts in the field of real estate appraisal, it chose to credit the town's experts. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.... The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony he reasonably believes to be credible.... On appeal, we do not retry the facts or pass on the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) Newbury Commons Ltd. Partnership v. Stamford , 226 Conn. 92, 99, 626 A.2d 1292 (1993).
As the trial court explained, it was convinced by the town's experts, both Kerin and Leary, that a national chain pharmacy submarket exists and that the highest and best use of the subject property is within this submarket. The trial court's findings as to the property's special features for a national retail pharmacy-namely, that it is a freestanding building located at a corner with a traffic signal at the intersection, which has been remodeled and is under a triple net lease-have strong **512 support in the record. Therefore, we cannot conclude that the trial court's finding that the highest and best use of the subject property as a retail pharmacy is clearly erroneous.
The trial court's finding of the existence of a national chain pharmacy submarket also is supported by our sister state, New York, where this issue recently has been addressed. For instance, the Appellate Division of the Supreme Court of New York has determined that "there is no serious dispute" that a "national submarket for the sale and purchase of built-to-suit net lease national chain drugstores" exists, noting that "sales and rental data for that submarket [are] readily available ...." Rite Aid Corp. v. Huseby , 130 App. Div. 3d 1518, 1521-22, 13 N.Y.S.3d 753 (2015), appeal denied, 26 N.Y.3d 916, 47 N.E.3d 90, 26 N.Y.S.3d 760, cert. denied, --- U.S. ----, 137 S.Ct. 174, 196 L.Ed.2d 124 (2016) ; see also Rite Aid Corp. v. Haywood , 130 App. Div. 3d 1510, 1513, 15 N.Y.S.3d 523 (2015) (same), appeal denied, 26 N.Y.3d 915, 47 N.E.3d 90, 26 N.Y.S.3d 760, cert. denied, --- U.S. ----, 137 S.Ct. 174, 196 L.Ed.2d 124 (2016) ; Rite Aid of New York No. 4928 v. Assessor of Town of Colonie , 58 App. Div. 3d 963, 965-66, 870 N.Y.S.2d 642 (rejecting claim that it was incorrect to consider evidence of net lease drugstore submarket as method of valuation), appeal denied, 12 N.Y.3d 709, 908 N.E.2d 925, 881 N.Y.S.2d 17 (2009). Accordingly, we conclude that the trial court's determination of the highest and best use of the subject property as a retail pharmacy is not clearly erroneous.
In conclusion, we reject the plaintiff's claim that, although the trial court properly found that it had established aggrievement under § 12-117a, the trial court's order of relief was insufficient. Instead, we conclude that the trial court's award of relief in the present case was proper because the trial court properly determined the true and actual value of the plaintiff's property.
**513 II
The plaintiff next claims that the trial court incorrectly concluded that the plaintiff failed to establish a manifestly excessive valuation of the property under § 12-119. As grounds for its claim, the plaintiff asserts that the valuation of the subject property was excessive when compared to other properties in town. The town responds that the trial court correctly concluded *407 that the plaintiff failed to meet its high burden pursuant to § 12-119. We agree with the town.
"In a tax appeal taken pursuant to § 12-119, the plaintiff must prove that the assessment was (a) manifestly excessive and (b) ... could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of the property.... [The plaintiff] must [set forth] allegations beyond the mere claim that the assessor overvalued the property. [The] plaintiff ... must satisfy the trier that [a] far more exacting test has been met: either there was misfeasance or nonfeasance by the taxing authorities, or the assessment was arbitrary or so excessive or discriminatory as in itself to show a disregard of duty on their part.... Only if the plaintiff is able to meet this exacting test by establishing that the action of the assessors would result in illegality can the plaintiff prevail in an action under § 12-119. The focus of § 12-119 is whether the assessment is illegal.... The statute applies only to an assessment that establishes a disregard of duty by the assessors....
"While an insufficiency of data or the selection of an inappropriate method of appraisal could serve as the basis for not crediting the appraisal report that resulted, it could not, absent evidence of misfeasance or malfeasance , serve as the basis for an application for relief from a wrongful assessment under § 12-119.... In short, when reviewing a claim raised under § 12-119, a **514 court must determine whether the plaintiff has proven that the assessment was the result of illegal conduct." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) Redding Life Care, LLC v. Redding , supra, 308 Conn. at 105-106, 61 A.3d 461.
Here, the plaintiff's sole claim of error under § 12-119 is that the valuation of the subject property was excessive when viewed in comparison to other properties in town. The testimony at trial demonstrated that the town applied the same process to valuing the other properties that it applied to the subject property, and Leary testified as to why the other properties were dissimilar to the subject property-namely, because they were smaller, less recently remodeled, and not stand alone buildings at a corner with a traffic signal.
Furthermore, even though the plaintiff has established that its property was overvalued, "[m]ere overvaluation, without more, in an assessment of property is not enough to make out a case under § 12-119...." E. Ingraham Co. v. Bristol , 146 Conn. 403, 408-409, 151 A.2d 700 (1959), cert. denied, 361 U.S. 929, 80 S.Ct. 367, 4 L.Ed.2d 352 (1960). Moreover, because we concluded in part I of this opinion that the trial court correctly determined the true and actual value of the plaintiff's property as $4,900,000, and the town originally valued the property at $5,020,000, "we conclude that the circumstances presented here do not rise to the level of the extraordinary situation that would warrant tax relief under the provisions of § 12-119." Second Stone Ridge Cooperative Corp. v. Bridgeport , 220 Conn. 335, 343, 597 A.2d 326 (1991) ; see also id. ("[b]ecause we are not faced with a situation involving the absolute nontaxability of the property and because the selection of an inappropriate method of appraisal or a paucity of the underlying data in connection with an appraisal, without more, is not manifestly illegal under our statutes, we conclude that the circumstances presented **515 here do not rise to the level of the extraordinary situation that would warrant *408 tax relief under the provisions of § 12-119").
Accordingly, we conclude that the trial court properly determined that the plaintiff did not meet its burden to establish a claim under § 12-119.
The judgment is affirmed.
In this opinion the other justices concurred.

General Statutes § 12-117a provides in relevant part: "Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court.... The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable ...."
Although § 12-117a was amended in 2013; see Public Acts 2013, No. 13-276, § 5; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

General Statutes § 12-119 provides in relevant part: "When it is claimed that a tax has been laid on property not taxable in the town or city in whose tax list such property was set, or that a tax laid on property was computed on an assessment which, under all the circumstances, was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property, the owner thereof or any lessee thereof whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, prior to the payment of such tax, may, in addition to the other remedies provided by law, make application for relief to the superior court for the judicial district in which such town or city is situated.... In all such actions, the Superior Court shall have power to grant such relief upon such terms and in such manner and form as to justice and equity appertains ...."

General Statutes § 12-62 (b) (1) provides: "Commencing October 1, 2006, each town shall implement a revaluation not later than the first day of October that follows, by five years, the October first assessment date on which the town's previous revaluation became effective, provided, a town that opted to defer a revaluation, pursuant to section 12-62l , shall implement a revaluation not later than the first day of October that follows, by five years, the October first assessment date on which the town's deferred revaluation became effective. The town shall use assessments derived from each such revaluation for the purpose of levying property taxes for the assessment year in which such revaluation is effective and for each assessment year that follows until the ensuing revaluation becomes effective."

General Statutes § 12-63b provides: "(a) The assessor or board of assessors in any town, at any time, when determining the present true and actual value of real property as provided in section 12-63, which property is used primarily for the purpose of producing rental income, exclusive of such property used solely for residential purposes, containing not more than six dwelling units and in which the owner resides, shall determine such value on the basis of an appraisal which shall include to the extent applicable with respect to such property, consideration of each of the following methods of appraisal: (1) Replacement cost less depreciation, plus the market value of the land, (2) capitalization of net income based on market rent for similar property, and (3) a sales comparison approach based on current bona fide sales of comparable property. The provisions of this section shall not be applicable with respect to any housing assisted by the federal or state government except any such housing for which the federal assistance directly related to rent for each unit in such housing is no less than the difference between the fair market rent for each such unit in the applicable area and the amount of rent payable by the tenant in each such unit, as determined under the federal program providing for such assistance.
"(b) For purposes of subdivision (2) of subsection (a) of this section and, generally, in its use as a factor in any appraisal with respect to real property used primarily for the purpose of producing rental income, the term 'market rent' means the rental income that such property would most probably command on the open market as indicated by present rentals being paid for comparable space. In determining market rent the assessor shall consider the actual rental income applicable with respect to such real property under the terms of an existing contract of lease at the time of such determination."

The plaintiff appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The plaintiff also claims that the trial court improperly valued the user-namely, the value of the plaintiff as a company and its value in the location-rather than the value of the property. In support of its claim, the plaintiff relies solely on the fact that the trial court incorrectly considered the plaintiff's lease when valuing the subject property. As we explain in parts I A and I B of this opinion, the trial court properly considered rent due under the plaintiff's lease pursuant to § 12-63b (b). Accordingly, for the reasons fully set forth in parts I A and I B of this opinion, we reject the plaintiff's claim that the trial court improperly valued the user instead of the subject property.

See footnote 4 of this opinion.

The trial court explained: "As a practical matter, the issue here devolves into a question of defining the relevant market or, in reality, the highest and best use of the property. If a market exists for properties that produce relatively high rents with minimal landlord responsibilities, then the leased fee value of the sale may coincide with the fee simple value. In this case, as discussed, it is possible to identify this sort of discrete market in the case of properties suitable for building and renting to a single pharmacy with a triple net lease. As discussed, the subject property has these characteristics.
"It therefore follows that the highest and best use of the property is to lease it to a retail pharmacy and that it is fully permissible to consider the rental potential of the property in determining the true and actual value of its fee simple interest. Only Kerin's appraisal takes this approach. For these reasons, the court credits Kerin's appraisal."

The Dictionary of Real Estate Appraisal uses "fee simple interest" interchangeably with "fee simple estate," and "leased fee interest" interchangeably with "leased fee estate." The Dictionary of Real Estate Appraisal, supra, pp. 90, 128. For the purposes of clarity, we use the terms "fee simple interest" and "leased fee interest."

The plaintiff seems to assert that the market and contract rents in Sheridan v. Killingly , supra, 278 Conn. at 252, 897 A.2d 90, were considered because the contract rents were below market value and its holding does not extend to contract rents that are above market value. We disagree. In First Bethel Associates and Sheridan , this court concluded that both contract and market rents should be considered when determining the fair market value of a rental property and placed no such limitation on the consideration of contract rents only when they are below market rents.

The plaintiff cites Walgreen Co. v. Oshkosh , Docket No. AP2818, 359 Wis.2d 675, 2014 WL 7151754, *3 (App. 2014), in which the Wisconsin Court of Appeals rejected the defendant city's assessment and its conclusion that the highest and best use of the plaintiff's properties was "continued use as [first] generation freestanding drug stores ...." (Emphasis omitted; internal quotation marks omitted.) A review of the court's analysis demonstrates that it rejected the city's highest and best use determination because that determination allowed the city to violate a previous decision of the Wisconsin Supreme Court, which had concluded in a previous case that " 'the assessor must use the market rent, not the contract rent' " to value retail property leased at above market rents. Id., quoting Walgreen Co. v. Madison , 311 Wis. 2d 158, 198, 752 N.W.2d 687 (2008). Specifically, the Wisconsin Court of Appeals determined "that where contractual rights inflate the value of leased retail property, assessors must look to the market to reach their valuations. '[A]n assessor's task is to value the real estate, not the business concern which may be using the property.' " Walgreen Co. v. Oshkosh , supra, at *1, quoting Walgreen Co. v. Madison , supra, at 197, 752 N.W.2d 687. The plaintiff also cites to a similar case from Indiana, Shelby County Assessor v. CVS Pharmacy, Inc. , 994 N.E.2d 350 (Ind. Tax 2013). In that case, the Indiana Tax Court concluded that the Indiana Board of Tax Review correctly rejected an assessor's conclusion that the contractual rent of a stand-alone drugstore should be used in the income approach under Indiana law. Because Connecticut law requires the consideration of both market and contract rent for valuations pursuant to § 12-63b (b), we conclude that Oshkosh and Shelby County Assessor are inapplicable to the present case.

The plaintiff asserts that a plenary standard of review should apply to the trial court's highest and best use determination because the trial court improperly valued the leased fee interest rather than the fee simple interest and this incorrect legal conclusion impacted its determination of the highest and best use. We disagree. It is well established that a trial court's determination of the highest and best use of property is a factual determination subject to a clearly erroneous standard of review. Furthermore, we conclude in part I B of this opinion that the trial court did not value the incorrect interest in the property. Instead, consistent with this court's analysis in Redding Life Care, LLC v. Redding , supra, 308 Conn. at 102, 61 A.3d 461, we conclude that "the trial court reached its decision [on the highest and best use of the subject property] through ... the exercise of its discretion in crediting evidence and expert witness testimony ...." Accordingly, we conclude that the clearly erroneous standard of review is applicable to the plaintiff's claim regarding the highest and best use of the subject property.

Michaud's appraisal, citing a treatise authored by the Appraisal Institute, defined "highest and best use" as follows: "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported and financially feasible and that results in the highest value." See Appraisal Institute, The Appraisal of Real Estate (13th Ed. 2008). Barna provided the exact same definition, but cited to a more recent edition of the same source. See Appraisal Institute, The Appraisal of Real Estate (14th Ed. 2013). Kerin, citing the Dictionary of Real Estate Appraisal (5th Ed. 2010), used the following substantially similar definition: "[T]he use that should be made of a property as it exists. An existing improvement should be renovated or retained as is so long as it continues to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one."

In determining the highest and best use of the subject property, the trial court also explained that "[p]roperties of this type tend to attract investors in 'like kind' exchanges. See 28 U.S.C. § 1031 [2011]." The plaintiff asserts that it was clear error for the trial court to rely on § 1031, which prevents the recognition of certain gains or losses on real property for the purpose of federal income taxation, to support the valuation of the subject property. We disagree with the plaintiff's contention. The trial court merely mentioned § 1031 as one factor in deciding the highest and best use of the subject property. The trial court's consideration of the attractiveness of the existing triple net lease arrangement of the subject property was not clear error. To the contrary, there was ample evidence in the record to support the trial court's finding regarding the marketability of these properties. Specifically, Kerin testified: "The single tenant triple net property is very attractive to people who are doing § 1031 like kind exchanges. It's easy to identify properties. It's simple to understand ... there's not a lot of due diligence [that is] required, that may be required in a multi-tenant property. In a multi-tenant property, you've got to go through the whole shopping center to ... see what needs to be fixed up. On the single tenant [triple] net leased property, the tenant is responsible for the property. And, again, it's very simple to understand. You find a lot of § 1031 exchange buyers active in this national market." Accordingly, it was not clear error for the trial court to consider this evidence when determining the highest and best use of the subject property because it demonstrates what a willing buyer would pay a willing seller.