******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JOHN P. TUOHY ET AL. *v.* TOWN OF GROTON ET AL.
## (SC 20019)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiffs, owners of certain properties located in a particular residential neighborhood in the town of Groton, appealed to the trial court pursuant to statute (§ 12-119), seeking a reduction in the assessments to their properties resulting from a townwide revaluation conducted by the defendants, the town and its assessor. The plaintiffs' properties are each located in a planned community with exclusive access to certain amenities including a beach and a restaurant. The town hired T Co., a certified mass appraisal vendor, to assist with the revaluation. In connection with the revaluation, T Co.'s employees went to each property to gather information. T Co. also sought to confirm the physical characteristics of each property through individualized mailings. Once the information collected was entered into a database used to generate property values, T Co. produced a preliminary property record and sent its employees to each property again to ensure accuracy. T Co. subsequently conducted a preliminary ratio test, which involved comparing the median sale price resulting from certain arm's-length transactions and the median total value for the properties in the plaintiffs' neighborhood, which already reflected an adjustment factor that had been applied in the preceding revaluation. T Co. determined that the resulting median assessment to sales ratio for the plaintiffs' neighborhood fell outside of the acceptable range, and, consequently, T Co. and the town concluded that an increase in the adjustment factor was appropriate and necessary to bring the assessed values of the properties in the plaintiffs' neighborhood closer to fair market values. In challenging the defendants' assessments, the plaintiffs claimed, inter alia, that the defendants' uniform application of the adjustment factor to increase the assessed values of all of the properties in their neighborhood without further individualized consideration of each property violated § 12-119. The trial court concluded that the defendants' uniform application of the adjustment factor to the properties in the plaintiffs' neighborhood did not violate § 12-199, rejected the plaintiffs' argument that the defendants had disregarded a legal duty by applying ratio testing standards to specific neighborhoods, and credited testimony from both the assessor and T Co.'s project supervisor that the purpose of the higher adjustment factor was to adjust the assessments in order to bring them closer to fair market values. The trial court accordingly rendered judgment in favor of the defendants, from which the plaintiffs appealed. *Held* that the plaintiffs could not prevail on their claim that they were entitled to tax relief under § 12-119, this court having concluded that the defendants' uniform application of the adjustment factor to the properties in the plaintiffs' neighborhood was not illegal: although the plaintiffs' correctly observed that townwide ratio testing is required by regulation (§ 12-62i-3) prior to finalizing a reevaluation, reading that regulation to preclude the use of ratio testing or the application of adjustment factors specific to particular neighborhoods during the mass appraisal process would require reading additional language into its text, would be inconsistent with text in related regulations, and would conflict with another regulatory provision (§ 12-62f-4 [d]) that specifically contemplates such testing by neighborhood; moreover, the defendants' use of a ratio study and direct equalization via an adjustment factor, as applied to a specific neighborhood, during the mass appraisal process was supported by appraisal standards set forth in various publications from professional associations, including the Appraisal Standards Board of the Appraisal Foundation and the International Association of Assessing Officers; furthermore, certain data presented at trial demonstrating a decrease in home sales prices in the plaintiffs' neighborhood in the years preceding the revaluation were insufficient to establish illegality in the absence of evidence of the defendants' misfeasance or malfeasance, and the plaintiffs failed to

prove that the adjustment to the appraised value of their properties actually resulted in a manifest overvaluation of those properties relative to true and actual fair market values.

Argued November 16, 2018—officially released May 28, 2019

*Procedural History*

Appeal from tax assessments relating to certain residential property owned by the plaintiffs, brought to the Superior Court in the judicial district of New London, and transferred to the judicial district of New Britain, where the court, *Cohn*, *J.*, granted the plaintiffs' motion for class certification; thereafter, the case was transferred to the judicial district of Hartford and tried to the court, *Moll*, *J.*; judgment for the defendants, from which the plaintiffs appealed. *Affirmed.*

*Linda L. Morkan*, with whom was *John F.X. Peloso*, *Jr.*, for the appellants (plaintiffs).

*Eileen Duggan*, for the appellees (defendants).

*Opinion*

ROBINSON, C. J. In this appeal, we consider whether a municipality's assessor may apply a uniform adjustment factor to a neighborhood's appraised property values during the mass appraisal process for the revaluation of real property pursuant to General Statutes § 12-62 (b),[1] as a direct equalization measure in order to ensure that neighborhood is not undertaxed relative to others in the municipality. The plaintiffs, John P. Tuohy and numerous other owners of real property located in the Groton Long Point neighborhood,[2] brought this class action tax appeal pursuant to General Statutes § 12-119[3] against the defendants, the town of Groton (town) and Mary Gardner, its assessor, challenging the assessed value of their properties following the revaluation conducted by the town for its October 1, 2011 grand list (2011 revaluation). The plaintiffs now appeal[4] from the judgment in favor of the defendants, rendered after a trial to the court, upholding the legality of those assessments. On appeal, the plaintiffs claim that the trial court incorrectly determined that their assessments were not manifestly excessive because the defendants violated § 12-62 and numerous provisions of the Regulations of Connecticut State Agencies (regulations) promulgated by the state Office of Policy and Management (OPM); see Regs., Conn. State Agencies § 12-62i-1 et seq.; when they applied a flat, undifferentiated adjustment factor that increased the assessed value of all properties in Groton Long Point by 35 percent without individualized consideration of the unique characteristics of each property. We conclude that the defendants properly applied an adjustment factor as a direct equalization measure in connection with an assessment to sales ratio study conducted pursuant to various standards promulgated by the International Association of Assessing Officers (international association) in order to ensure that Groton Long Point bore its fair share of the town's municipal tax burden relative to the town's other neighborhoods. Accordingly, we affirm the judgment of the trial court.

The record reveals the following facts, as comprehensively found by the trial court, *Moll, J.*,[5] and procedural history. "The plaintiffs are residential property owners in the Groton Long Point . . . neighborhood[6] of [the town], who, on behalf of themselves and the certified class,[7] are challenging the [2011 revaluation]. [Groton Long Point] is a planned community and comprises approximately 600 properties. When someone owns property in [Groton Long Point], he or she pays into an association and has rights to use certain amenities within the community, including the beach, docks, piers, and association buildings, which include, among other things, a restaurant. In addition, parking in [Groton Long Point] requires a permit.

"The 2011 revaluation was a mass appraisal, defined

as 'the process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing. Methodology that is acceptable shall include, but is not limited to, automated valuation models, adaptive estimation procedure, multiple regression analysis, statistical analysis and other generally accepted techniques . . . .' Regs., Conn. State Agencies § 12-62i-1 (10). The 2011 revaluation was overseen by . . . Gardner . . . whose position as the town assessor began in June, 2011. Gardner first worked in the town's assessor office in 1986; she became a certified assessor in 1989. The 2011 revaluation was the first revaluation that Gardner conducted as an assessor.

"To assist it with the 2011 revaluation, the town hired Tyler Technologies (Tyler), a mass appraisal vendor certified by the state to do revaluations. [See General Statutes § 12-62 (e)]. The project supervisor from Tyler with respect to the 2011 revaluation was Debra Christy . . . who also is certified to do revaluations. Christy has been employed with Tyler, although not continuously, since 1980 and has been involved with revaluations in the state of Connecticut since around 1997. Christy had some responsibility in the 2006 revaluation of Groton but was not the manager. In the 2011 revaluation, Christy was responsible for the analysis for the residential property class.

"The 2011 revaluation commenced in earnest in April, 2010, at which time Gardner was the assistant assessor for the town. In April, 2010, the town issued a press release informing the public that a revaluation would be underway and that data collectors would be going door to door to measure the exteriors of all properties and to attempt interior inspection, if allowed. Tyler conducted its data collection using data from the 2006 revaluation and updating it. Because the 2011 revaluation was a full measure revaluation, Tyler [employees] knocked on every door and did an exterior measurement of every property. To the extent access to the interior was not granted, Tyler sent the property owner a callback letter to inquire whether the owner would make a scheduled appointment for an interior inspection. Tyler then prepared and distributed data mailers for each property; such data mailers reflected the property's physical characteristics that would be used in the revaluation. Property owners were asked to contact Tyler if any information required correction. Any changes resulting from the data mailer process were inputted into the Computer Assisted Mass Appraisal (CAMA) software system, which the town uses for its revaluations to generate property values. CAMA is certified by the state of Connecticut and is an example of an 'automated valuation model,' as that phrase is used in § 12-62i-1 (10) [of the regulations], which sets forth the definition of '[m]ass appraisal.' In CAMA, with respect to each property, a value is assigned to the

land,[8] and a value is assigned to any improvements or structures using the cost approach (i.e., the cost of replacement with an adjustment for depreciation). The improvements value comprises a dwelling value and an outbuilding value. One arrives at total value by adding land value and improvements value.

"Tyler then performed a prereview, which involved producing all of the property record cards that were in the system and having a certified field person go out to each property to conduct what Tyler called a 'windshield prereview check' to ensure that the information on the cards was accurate.

"After all data were collected and corrected during the eighteen-month period following the initial press release, Tyler engaged in preliminary ratio testing, which required compiling a validated sales set (i.e., sales involving actual warranty deeds) using a two year lookback period because of the number of sales.[9] With respect to [Groton Long Point], the sales set contained eighteen validated, arm's-length transactions. Tyler compared the median of the sales identified for each neighborhood against the median for the total value for the neighborhood. A 1:1 ratio, meaning the medians are equal, would be considered ideal. Tyler performed preliminary ratio testing for each of the thirteen neighborhoods within the town.[10] The same process was followed in 2006.

"On October 31 and November 1, 2011, Christy conducted four computer runs to create values for the [Groton Long Point] residential properties using the CAMA software. The 2006 revaluation had used an adjustment factor of 1.2 (i.e., a 20 percent increase in value) in setting the improvement values of the [Groton Long Point] properties. Those adjustments were already reflected in the CAMA database that Christy used in conducting her analyses. Because an adjustment factor of 1.2 was used in 2006 with respect to [Groton Long Point] improvement values, Christy used that adjustment factor as a starting point. Application of an adjustment factor of 1.2 yielded a median assessment to sales ratio (ASR)[11] of 88.31 percent for [Groton Long Point]. Christy found this ratio to be outside an acceptable range because it fell under 90 percent.[12] In this regard, Tyler and the town deemed [Groton Long Point] to be an outlier. Specifically, in reaching this conclusion, Christy relied on the [international association's][13] principle that, when looking at the level of assessment, if market value is 100 percent, the [median] ASR should be plus or minus 10 percent around market value. Applying an adjustment factor of 1.4 yielded a median ASR of 95.08 percent. Applying an adjustment factor of 1.4 with a waterfront adjustment yielded a median ASR of 97.56 percent. Finally, application of an adjustment factor of 1.35 yielded a median ASR of 92.03 percent.

"Tyler and the town concluded that applying an

adjustment factor of 1.35 to the dwelling values within [Groton Long Point] was appropriate and necessary to reach fair market value. Christy reasoned that other variables, including a coefficient of dispersion, fell within a preferred range to reach uniformity. [Tyler did not physically reinspect any of the Groton Long Point properties prior to applying the 1.35 adjustment factor.][14]

"Christy conducted sales ratio studies with respect to each of the other twelve neighborhoods. Using a 1.0 factor, each neighborhood's median ASR landed above 90 percent (and below 100 percent market value). For each of the other neighborhoods, the resulting median ASRs were as follows:

1010—Center Groton 91.80 percent
1020—City of Groton 92.99 percent
1021—City of Groton—Eastern 96.43 percent
1030—Poquonock Bridge 96.28 percent
1040—Mystic 94.10 percent
1041—Mystic Village 94.37 percent
1050—Noank 95.08 percent
1051—Noank Village 94.69 percent
1060—Old Mystic 96.46 percent
1061—Old Mystic—River Road 95.14 percent
1080—West Pleasant Valley 95.73 percent
1090—Mumford Cove 94.78 percent

Because these median ASRs fell above 90 percent, and therefore were deemed acceptable, no adjustments were made.

"Thereafter, Tyler entered into what it called the final review phase. Because the town had elected to use ratio testing standards, and not procedural testing standards, Christy conducted ratio testing to residential property townwide to assure satisfaction of the requirements of § 12-62i-3 (b) [of the regulations]. Such testing to such property class on a townwide basis resulted in those criteria being met on the first try. Therefore, no further analysis was performed pursuant to § 12-62i-3 (c). The town subsequently submitted to [OPM] the statutorily required certification of compliance, which was signed by Christy and Gardner and which reflected that the town utilized ratio testing standards."[15] (Footnotes added and in original.)

The plaintiffs subsequently brought this class action pursuant to § 12-119, seeking reduction of the assessments on the relevant properties in Groton Long Point. The plaintiffs claimed, inter alia, that the "uniform application of the 1.35 adjustment factor to residential buildings" violated § 12-119 because (1) "the application of a fixed percentage factor to increase assessments without making any allowance for individual differences in properties has been widely condemned by the courts of this state," (2) "the basic deficiency of such a valuation procedure is the failure to consider all of the elements

which may reasonably affect the value of the property," (3) "the assumption that residential buildings in Groton Long Point are worth 35 percent more than comparable structures elsewhere in the town, including but not limited to structures in the sections of town classified as Mumford Cove, Mystic Village, and Noank Village, is arbitrary, unreasonable, and without foundation in fact," and (4) "the application of the fixed percentage factor by the assessor to increase the assessments on properties in Groton Long Point cannot reasonably be found to fulfill her statutory duty to determine the true and actual valuation of each individual property, in violation of [General Statutes] § 12-64 . . . ."

Following certification of the class; see footnote 7 of this opinion; the case was tried to the court.[16] After conducting a comprehensive review of the governing statutory and regulatory framework, and particularly the ratio testing standard set forth in § 12-62i-3 of the regulations[17] for evaluating the performance of the revaluation process, the trial court concluded that the "1.35 adjustment factor applied to the [Groton Long Point] dwelling values did not violate § 12-119." In so concluding, the trial court rejected the plaintiffs' argument that the defendants had disregarded a legal duty insofar as the ratio testing standards may be applied only on a townwide basis, rather than to specific neighborhoods on a preliminary basis. The trial court also rejected the plaintiffs' reliance on *Chamber of Commerce of Greater Waterbury, Inc.* v. *Waterbury*, 184 Conn. 333, 439 A.2d 1047 (1981), for the "proposition that, in the revaluation context, the application of a fixed percentage without allowance for individual property differences is illegal pursuant to § 12-119"; the court distinguished that case factually with respect to the extensive, individualized data collection that took place in the present case. To this end, the trial court concluded that Tyler was not required to "physically [re]inspect the [Groton Long Point] residential properties" after it discovered that the initial "application of the original 1.2 adjustment factor yielded a median ASR of 88.31 percent . . . ."[18] Having credited the testimony of Gardner and Christy to the effect that the 1.35 adjustment factor "was used for the express purpose of increasing the [Groton Long Point] appraised values so that they would be closer to fair market value, instead of well below fair market value," the trial court rejected the plaintiffs' claim that "their assessments were manifestly excessive" and the "illegal" result of "disregard of the relevant statutes . . . ." Accordingly, the trial court rendered judgment for the defendants. This appeal followed.

On appeal, the plaintiffs claim that the trial court incorrectly concluded that the defendants' assessment of Groton Long Point in the 2011 revaluation was not illegal. The plaintiffs renew their reliance on *Chamber of Commerce of Greater Waterbury, Inc.*, and contend

that the defendants' use of an undifferentiated adjustment factor of 1.35 disregarded the "individualized process" required by § 12-62, insofar as "[t]here is no provision in our state statutes or the pertinent regulations that allows an assessor to apply a flat percentage to a group of properties simultaneously in order to 'adjust' their true and actual value." The plaintiffs further argue that the defendants' use of the adjustment factor was not authorized by § 12-62i-3 of the regulations, which contemplates the use of ratio testing for property classes, namely, residential, commercial, and vacant land, rather than "on much smaller groups, i.e., residential neighborhoods," and only to verify results, not "to actually set the assessed values themselves." The plaintiffs contend that any discrepancy resulting from the initial mass appraisal should have been addressed by "physically revisit[ing] those properties [to] verify the data collection and the information it produced," rather than arbitrarily "running calculations until the numbers (subjectively) seem to more closely approximate some ideal of fair market value in the assessor's mind . . . ."[19] Finally, the plaintiffs rely on *Hartford/Windsor Healthcare Properties, LLC* v. *Hartford*, 298 Conn. 191, 3 A.3d 56 (2010), and argue that the trial court improperly found that they had "failed to demonstrate that the 2011 [revaluation] resulted in assessments that are manifestly excessive," because that determination is "part and parcel of the stipulation that the defendants uniformly inflated the assessed value of the subject properties by 35 percent even though such an adjustment was not required in order to comply with the statutory standards."

In response, the defendants contend that they properly utilized the 1.35 adjustment factor to compensate for patterns of undervaluation of Groton Long Point properties relative to other neighborhoods in the town. The defendants argue that this methodology was consistent with the OPM regulations and the standards of the international association, and emphasize that OPM itself ultimately certified the results of the appraisal. Thus, the defendants also rely on *Redding Life Care, LLC* v. *Redding*, 308 Conn. 87, 61 A.3d 461 (2013), and contend that the plaintiffs have failed to prove a violation of § 12-119 because their complaint of "inadequate substantiation to support application of the 1.35 adjustment factor" pertains to insufficiency of data and a challenge to the appraisal methodology, rather than demonstrating illegality. The defendants further argue that *Chamber of Commerce of Greater Waterbury, Inc.* v. *Waterbury*, supra, 184 Conn. 333, is distinguishable from the present case because, in addition to engaging in a comprehensive preappraisal field data gathering as to every property in town, Tyler reanalyzed that field data subsequent to the adjustment to verify the consistency of the mass appraisal results with actual property values as determined by sales. Finally, the defendants

contend that the plaintiffs failed to prove that the valuation of their properties was manifestly excessive because they did not present any credible evidence of the values of their properties. We agree with the defendants and conclude that their application of the 1.35 adjustment factor to the Groton Long Point residential properties during the 2011 revaluation was not illegal.

"In a tax appeal taken pursuant to § 12-119, the plaintiff must prove that the assessment was (a) manifestly excessive *and* (b) . . . could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of the property. . . . [The plaintiff] must [set forth] allegations beyond the mere claim that the assessor overvalued the property. [The] plaintiff . . . must satisfy the trier that [a] far more exacting test has been met: either there was misfeasance or nonfeasance by the taxing authorities, or the assessment was arbitrary or so excessive or discriminatory as in itself to show a disregard of duty on their part. . . . Only if the plaintiff is able to meet this exacting test by establishing that the action of the assessors would result in illegality can the plaintiff prevail in an action under § 12-119. The focus of § 12-119 is whether the assessment is illegal. . . . The statute applies *only* to an assessment that establishes a disregard of duty by the assessors. . . .

"While an insufficiency of data or the selection of an inappropriate method of appraisal could serve as the basis for not crediting the appraisal report that resulted, it could not, *absent evidence of misfeasance or malfeasance*, serve as the basis for an application for relief from a wrongful assessment under § 12-119. . . . In short, when reviewing a claim raised under § 12-119, a court must determine whether the plaintiff has proven that the assessment was the result of illegal conduct."[20] (Emphasis in original; internal quotation marks omitted.) *Walgreen Eastern Co.* v. *West Hartford*, 329 Conn. 484, 513–14, 187 A.3d 388 (2018). Put differently, tax relief under § 12-119 is available only in an "extraordinary situation." *Second Stone Ridge Cooperative Corp.* v. *Bridgeport*, 220 Conn. 335, 343, 597 A.2d 326 (1991).

Whether an assessment methodology violates the governing statutes and regulations for purposes of § 12-119 presents a question of law over which our review is plenary. See, e.g., *Griswold Airport, Inc.* v. *Madison*, 289 Conn. 723, 739, 961 A.2d 338 (2008); see also *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 101 ("[w]hen a tax appeal . . . raises a claim that challenges the propriety of a particular appraisal method in light of a generally applicable rule of law, our review of the trial court's determination whether to apply the rule is plenary" [internal quotation marks omitted]); *Griswold Airport, Inc.* v. *Madison*, supra, 741–42 (applying plenary review to claim that assessor violated

General Statutes § 12-504h by terminating property's open space classification and assessing it as condominium units).

Our review of the legality of the assessment begins with the OPM regulations, which were promulgated pursuant to § 12-62 (g); see footnote 17 of this opinion; for the purpose of guiding the revaluation process under § 12-62 (b) (2), which contemplates both a "field review" of the properties and the use of "generally accepted mass appraisal methods which may include, but need not be limited to, the market sales comparison approach to value, the cost approach to value and the income approach to value." Beyond the regulations, we also consider the extent to which the appraisal complied with the Uniform Standards of Professional Appraisal Practice, as promulgated by the Appraisal Standards Board of the Appraisal Foundation, which "[r]eal estate appraisers in Connecticut are required to follow" pursuant to General Statutes § 20-504. *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 107 n.18.

Section 12-62 (g) (2) mandates the promulgation of regulations "establishing criteria for measuring the level and uniformity of assessments generated from a revaluation," and provides that "such criteria shall be applicable to different classes of real property with respect to which a sufficient number of property sales exist." The regulations promulgated by OPM in response to that mandate, in turn, provide that "[p]erformance-based revaluation standards shall consist of two acceptable methods as set forth in section[s] 12-62i-3 and 12-62i-4 of the [r]egulations . . . ." Regs., Conn. State Agencies § 12-62i-2. Ratio testing, one of the two acceptable methods, is governed by § 12-62i-3 of the regulations. That regulation requires an assessor conducting ratio testing to establish "[a] file of all real property sales transactions for the sales time period used"; Id., § 12-62i-3 (a) (1); and also provides that, "[p]rior to finalizing a revaluation, the assessor shall conduct the following tests regarding the assessments derived from such revaluation. The assessments resulting from the revaluation shall be deemed sufficient, provided the following criteria are met:

"(1) the overall level of assessment for all property classes shall be within plus or minus ten percent of the required seventy percent assessment ratio, as measured by the overall median ratio, and

"(2) the level of assessment for each property class with fifteen or more market sales shall be within plus or minus five percent of the median overall level of assessment for each property class, and

"(3) the coefficient of dispersion for each property class with fifteen or more market sales shall be equal to or less than fifteen percent for all property, equal to or less than fifteen percent for residential property,

equal to or less than twenty percent for commercial property, and equal to or less than twenty percent for vacant land, and

"(4) the price related differential for all properties and for each property class for which there are fifteen or more market sales shall be within 0.98 and 1.03, and

"(5) the unsold property test result shall be between 0.95 and 1.05." Id., § 12-62i-3 (b).

The ratio testing regulation further provides that, if its criteria "are not met, the assessor shall, prior to the implementation of the revaluation, further analyze and refine the data elements or methods used in the revaluation. The assessor shall revalue the parcels of real property for which a deficiency in either the level of assessment or the uniformity of assessments has been identified." Id., § 12-62i-3 (c).

The plaintiffs correctly read the ratio testing regulation as *mandating* such evaluation following the completion of the appraisal by general " '[p]roperty class,' " which is defined as "any one of the following three major classifications of real property: (A) residential; (B) commercial including apartments, industrial and public utility; and (C) vacant land . . . ." Id., § 12-62i-1 (15). There are, however, two problems with the plaintiffs' interpretation of the ratio testing regulation. First, that regulation does not expressly preclude the use of ratio testing or adjustment factors *during* the mass appraisal process by " '[n]eighborhood,' " which is defined as "a geographic area of complementary real property parcels that share similar locational and market value characteristics, and may be defined by natural, man-made, or political boundaries . . . ." Id., § 12-62i-1 (13). Reading the ratio testing regulation in the manner urged by the plaintiffs would require us to add nonexistent language to its text, which is not how we read regulations. See, e.g., *Williams* v. *General Nutrition Centers, Inc.*, 326 Conn. 651, 657, 166 A.3d 625 (2017) ("because regulations have the same force and effect as statutes, we interpret both using the plain meaning rule"); *Mayer* v. *Historic District Commission*, 325 Conn. 765, 776, 160 A.3d 333 (2017) ("it is well settled that [w]e are not permitted to supply statutory language that the legislature may have chosen to omit" [internal quotation marks omitted]).

Second, the plaintiffs' reading of § 12-62i-3 of the regulations is inconsistent with the other regulatory text, which defines " '[r]evaluation' " as "the mass appraisal of property to determine the true and actual value of all real property in a town for assessment purposes in accordance with section 12-62 . . . ." Regs., Conn. State Agencies § 12-62i-1 (19). The very meaning of " '[m]ass appraisal' " contemplates some estimation, insofar as it is defined as "the process of valuing a universe of properties as of a given date using

standard methodology, employing common data, and allowing for statistical testing. Methodology that is acceptable shall include, but is not limited to, automated valuation models, adaptive estimation procedure, multiple regression analysis, statistical analysis and other generally accepted techniques . . . ." Id., § 12-62i-1 (10). Indeed, § 12-62f-4 of the regulations, which governs the valuation module to be used for computer assisted mass appraisal, specifically anticipates such testing on a neighborhood basis, as such a valuation module must have "the capacity to calculate, print reports and output to standard analytical software programs the following measurements and sales/assessment ratios by property type *and neighborhood*: Sales prices; assessments; the mean sales/assessment ratio; the median sales/assessment ratio; the coefficient of dispersion; the standard deviation; the coefficient of variation; and the price-related differential." (Emphasis added.) Id., § 12-62f-4 (d). Thus, to read § 12-62i-3 of the regulations in a manner absolutely precluding ratio testing on a more granular level than property class *during* the mass appraisal process would make little sense, as that regulation simply furnishes a broad measure of quality control to be implemented "[p]rior to finalizing a revaluation . . . ." Id., § 12-62i-3 (b).

Beyond the lack of regulatory or statutory preclusion, the Uniform Standards of Professional Appraisal Practice support the defendants' use of a ratio study during the mass appraisal process at issue in the present case.[21] Specifically, rule 6-7 of the Uniform Standards of Professional Appraisal Practice provides that "[i]n reconciling a mass appraisal an appraiser must: (a) reconcile the quality and quantity of data available and analyzed within the approaches used and the applicability and relevance of the approaches, methods and techniques used; and (b) employ recognized mass appraisal testing procedures and techniques to ensure that standards of accuracy are maintained." Appraisal Standards Board, Appraisal Foundation, 2010-11 Uniform Standards of Professional Appraisal Practice (2010) p. U-51. The commentary to that rule observes that "[i]t is implicit in mass appraisal that, even when properly specified and calibrated mass appraisal models are used, some individual value conclusions will not meet standards of reasonableness, consistency, and accuracy. However, appraisers engaged in mass appraisal have a professional responsibility to ensure that, on an overall basis, models produce value conclusions that meet attainable standards of accuracy. *This responsibility requires appraisers to evaluate the performance of models, using techniques that may include* but are not limited to, goodness-of-fit statistics, and *model performance statistics such as appraisal-to-sale ratio studies*, evaluation of hold-out samples, or analysis of residuals." (Emphasis added.) Id.; see also id., p. U-53 (noting that written report of mass appraisal must "describe calibra-

tion methods considered and chosen," "identify the appraisal performance tests used and set forth the performance measures attained," and "describe the reconciliation performed [under rule] 6-7").

Consistent with the Uniform Standards of Professional Appraisal Practice, the use of ratio studies and "direct equalization" via the application of adjustment factors are an established component of mass appraisal practice, and are specifically embraced by the international association. See generally International Association of Assessing Officers, Standard on Ratio Studies (2013); International Association of Assessing Officers, Fundamentals of Mass Appraisal (2011).[22] The "assessment standards set forth" in the international association's standards "represent a consensus in the assessing profession," and the international association's executive board adopted them in order to "provide a systematic means by which concerned assessing officers can improve and standardize the operation of their offices." Standard on Ratio Studies, supra, p. 1. Those standards have been considered authoritative in this area by sister state high courts. See *Douglas* v. *Nebraska Tax Equalization & Review Commission*, 296 Neb. 501, 508, 894 N.W.2d 308 (2017) ("[g]enerally accepted mass appraisal techniques include the standards promulgated by the [international association]"); *Clifton* v. *Allegheny*, 600 Pa. 662, 694, 969 A.2d 1197 (2009) (noting that international association standards "are widely accepted as the best criteria for judging the adequacy of a property assessment"); see also *Thorsness* v. *Porter County Assessor*, 3 N.E.3d 49, 53 (Ind. Tax 2014) (noting that state "administrative agency charged with ensuring that . . . property assessments are uniform and equal—has provided guidance about how to compile and evaluate the data necessary for an assessment ratio study" by adopting international association's standards "through its duly promulgated administrative regulations" [footnote omitted]). A separate publication by the international association, entitled Fundamentals of Mass Appraisal, complements their standards and serves as a more general "textbook [that] is intended to provide a basic understanding and overview of the many factors that shape mass appraisal theory and practice." Fundamentals of Mass Appraisal, supra, p. v.

Beyond their use in quality control by oversight agencies such as OPM, the international association's standards suggest specifically that ratio studies may be utilized internally to "help improve appraisal methods or identify areas within the jurisdiction that need attention." Standard on Ratio Studies, supra, p. 7. Ratio studies may be used to consider the accuracy of a mass appraisal, including with respect to "[u]niformity" or "the degree to which properties are appraised at equal percentages of market value."[23] Id.; see also id., p. 8 ("Local jurisdictions should use ratio studies as a primary mass appraisal testing procedure and their most

important performance analysis tool. The ratio study can assist such jurisdictions in providing fair and equitable assessment of all property."). The "ratio study is a form of applied statistics, because the analyst draws conclusions about the appraisal of the population (the entire jurisdiction) of properties based only on those that have sold during a given time period. The sales ratios constitute the sample that will be used to draw conclusions or inferences about the population." Id., p. 8.

With respect to data collection and analysis, the international association's standards contemplate "[s]tratification [to divide] all the properties within the scope of the study into two or more groups or strata," which "facilitates a more complete and detailed picture of appraisal performance and can enhance sample representativeness." Id., p. 9. In observing that stratification can "help identify differences in level of appraisal between property groups," those standards specifically suggest that "neighborhood" is an appropriate stratum, in addition to "[e]ach type of property subject to a distinct level of assessment," with "stratification by geographic areas . . . generally more appropriate for residential properties . . . ." Id. Once appropriate sales are identified during the collection of market data, the statistical analysis takes place, as those sales are "matched against assessed values, ratios computed, and outliers identified and removed if appropriate, measures of appraisal level, uniformity, and reliability for the entire jurisdiction and each group or stratum should be computed." Id.

The international association allows for a 10 percent "window . . . about the market value standard [as] a reasonable range in which measures of central tendency should fall in ad valorem mass appraisal." Fundamentals of Mass Appraisal, supra, p. 243. This "standard provides a reasonable, constructive, and cost-effective basis for ensuring that appraisals approximate market values." Id. With respect to uniformity among the various strata, "[e]ach major stratum should be appraised within 5 percent of the overall level of appraisal for the jurisdiction. Thus, if the overall level is 0.900, each property class and area should be appraised between 0.855 and 0.945 . . . ." Id.; see also Standard on Ratio Studies, supra, pp. 18–19.

Most significantly, the international association's standards contemplate the "common" use of "[e]qualization . . . to address problems associated with appraisal level," while also observing that "[r]eappraisal orders can be used to correct uniformity problems." Standard on Ratio Studies, supra, p. 21. "Equalization," in general, is the "process by which an appropriate governmental body attempts to ensure that property under its jurisdiction is assessed at the same assessment ratio or at the ratio or ratios required by law. Equaliza-

tion can be undertaken at many different levels. Equalization among use classes (such as agricultural and industrial property) can be undertaken at the local level . . . ." Id., p. 40. "Direct equalization"[24] is the "process of converting ratio study results into adjustment factors (trends) and changing locally determined appraised or assessed values to more nearly reflect market value or the legally required level of assessment."[25] Id.

Although the international association's standards caution that "[e]qualization is not an appraisal or a substitute for reappraisal," they nevertheless counsel that the advantage of direct equalization is that it "can be applied to specified strata, such as property classes, *geographic areas, and political subdivisions* that fail to meet appraisal level performance standards . . . . Direct equalization also produces results that are generally more visible to the taxpayer and more clearly reduces perceived inequities between classes . . . ." (Citations omitted; emphasis added.) Id., p. 21; see also id., p. 23 ("[o]ther property groups, such as market areas, school districts and tax units, could constitute additional strata"). Indeed, when "applied at the stratum level [direct equalization] improves equality in effective tax rates between strata and lessens the effect of assessment practices that improperly favor one stratum over another."[26] Id., p. 22. Those standards note that "[s]tratification can help identify differences in level of appraisal between property groups. In large jurisdictions, stratification by market areas is generally more appropriate for residential properties, while stratification of commercial properties by either geographic area or property subtypes (e.g., office, retail, and warehouse/industrial) can be more effective." Id., p. 24. Such "[s]tratification facilitates a more complete and detailed picture of appraisal performance and can enhance sample representativeness." Id., p. 23.

"If noncompliance with either direct or indirect equalization standards is indicated, the appropriate point estimate (statistic) measuring appraisal level should be used to calculate adjustment factors, by dividing it into 100 percent." Id., p. 35. Accordingly, we conclude that the record demonstrates that the use of ratio studies and direct equalization via adjustment factors as applied to a neighborhood stratum is a valid component of mass appraisal practice under the standards adopted by the international association.

Having determined that the defendants validly incorporated ratio studies and direct equalization via adjustment factors to neighborhood strata into the 2011 revaluation, we further conclude that the trial court properly rejected the plaintiffs' challenge to their use in this specific case. The trial court credited Gardner's testimony that the application of the 1.35 percent adjustment factor to the dwellings in Groton Long Point was necessary to bring the median ASR for that neighbor-

hood in line with the other neighborhoods in the town, and to keep the properties in Groton Long Point from being undervalued—and therefore undertaxed—relative to the rest of the town. Gardner testified that stratification by neighborhood was necessary because Groton has thirteen neighborhoods, each "unique to itself," with five on the water and others with "interior cookie cutter homes." Although the amenities available to Groton Long Point residents, such as the private beaches and dock, run with the land, Gardner elected to adjust the building values as a component of the total value, rather than the land values, because she had high confidence in the underlying land values based on a comparison to three valid vacant lot sales. "[T]his court has held that [t]he process of estimating the value of property for taxation is, at best, one of approximation and judgment, and there is a margin for a difference of opinion. . . . There may be more ways than one for estimating the value of such . . . [property] for taxation. . . . Many factors may enter into the determination of the value of a piece of property. Its value is, in the final analysis, a matter of opinion." (Citation omitted; internal quotation marks omitted.) *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 110.

This court's decision in *Chamber of Commerce of Greater Waterbury, Inc.* v. *Waterbury*, supra, 184 Conn. 333, on which the plaintiffs rely heavily, is distinguishable and does not invalidate the town's 2011 revaluation as a matter of law. In that case, we considered a challenge to Waterbury's revised grand list for October 1, 1979, which "consisted of adjustments made in the assessments of about 300 commercial and industrial properties, which [the assessor] and his staff inspected and analyzed individually, and a 28 percent increase 'across the board' in the assessments of the remaining commercial and industrial properties in Waterbury, approximately 2500 in number." Id., 334–35. This court affirmed the judgment of the trial court enjoining the fixed 28 percent increase, determining that the "application of a fixed percentage factor to increase assessments without making any allowance for individual differences in properties has been widely condemned. . . . The basic deficiency of such a valuation procedure is the failure to consider all of the elements which may reasonably affect the value of the property." (Citations omitted.) Id., 336–37.

In concluding that the fixed 28 percent increase without consideration of the properties' individual characteristics was illegal, this court observed that, under §§ 12-64 (a) and 12-62 (a), "[t]axable property is subject to taxation at a uniform percentage of 'its present true and actual valuation.' . . . In establishing assessments the assessors are required to 'view all of the real estate of their respective municipalities.' . . . These statutes contemplate assessments based upon a consideration of the individual characteristics of each property

listed." (Citations omitted.) Id., 337. The court concluded that the "28 percent increase in the valuations of the 2500 commercial and industrial properties which [the assessor] did not examine individually was a projection from the conclusion he reached from his analysis of 300 such properties upon an individual basis. His conclusion of a minimum 28 percent undervaluation of those properties could not fairly be applied to all other business properties in Waterbury without some showing that the undervaluation had occurred for reasons affecting all business properties alike. We cannot assume that the 300 properties studied by the assessor are *sufficiently similar in character or location* to allow a reasonable inference that the remaining 2500 properties have been uniformly undervalued by 28 percent."[27] (Emphasis added.) Id., 337. Accordingly, the court concluded "that the application of the fixed percentage factor by the assessor to increase the assessments on the properties of the plaintiffs cannot reasonably be found to fulfill his statutory duty to determine the 'true and actual valuation' of each individual property."[28] Id., 338.

*Chamber of Commerce of Greater Waterbury, Inc.*, is readily distinguishable from the present case. First, the record in the present case reveals that Gardner and the assessment team from Tyler made an individual assessment of every property in the town—including field visits, requests for inspections, and communications with each homeowner prior to the finalization of the assessment in accordance with § 12-62 (b) and § 12-62i-3 of the regulations. The trial court reasonably credited the testimony of Gardner and Christy that additional visits were not necessary prior to the application of the adjustment because they had gained all relevant information about the properties. See footnote 14 of this opinion and accompanying text. Second, in contrast to *Chamber of Commerce of Greater Waterbury, Inc.*, the adjustment in this case was not applied townwide, but rather, only to a narrow strata of properties in a unique neighborhood in connection with a computer assisted mass appraisal that was conducted in accordance with both the OPM regulations and widely accepted appraisal standards. Accordingly, we conclude that *Chamber of Commerce of Greater Waterbury, Inc.*, does not render the assessment in the present case illegal.[29]

The plaintiffs contend, however, that the application of the 1.35 adjustment factor was invalid because it was arbitrarily chosen by Christy, "had no mathematical or technical connection to the initial assessments made by the CAMA program, and was not intended to remedy some specific defect." They argue that it is "completely unrelated to the true and actual value of each home in Groton Long Point." To this end, the plaintiffs rely on certain data presented through the testimony of Edward Bogdan, a member of the certified class in the present

case; see footnote 7 of this opinion; in support of the proposition that Groton Long Point experienced a 25 percent decrease in home sale prices between 2009 and 2011. Specifically, the plaintiffs posit that this information undermines the sales set utilized by Christy in performing her assessments. This evidence is insufficient, however, to establish illegality, insofar as "[w]hile an insufficiency of data or the selection of an inappropriate method of appraisal could serve as the basis for not crediting the appraisal report that resulted, it could not, absent evidence of misfeasance or malfeasance, serve as the basis for an application for relief from a wrongful assessment under § 12-119." *Second Stone Ridge Cooperative Corp.* v. *Bridgeport*, supra, 220 Conn. 343; see also *Redding Life Care, LLC* v. *Redding*, supra, 308 Conn. 111 ("although the plaintiff may disagree that the hypothetical condition was *necessary* to reach the valuation, it has failed to demonstrate that the town assessor's reliance on the condition was *illegal*, and, accordingly, the plaintiff cannot prevail on its claim under § 12-119" [emphasis in original]). Moreover, the plaintiffs have failed to introduce evidence to prove that the adjustment to the appraised value—even by 35 percent—actually resulted in a manifest overvaluation of their properties relative to true and actual fair market value.[30] See *Walgreen Eastern Co.* v. *West Hartford*, supra, 329 Conn. 513 ("[m]ere overvaluation, without more, in an assessment of property is not enough to make out a case under § 12-119" [internal quotation marks omitted]); see also id., 513–14 ($120,000 valuation error on approximately $5 million property, which was 2.4 percent, was not manifestly excessive for purposes of relief under § 12-119); cf. *Griswold Airport, Inc.* v. *Madison*, supra, 289 Conn. 741–42 (because improper removal of airport's open space classification in violation of § 12-504h "caused its assessed value to grow more than eightfold," this court concluded that "the trial court's determination . . . necessarily incorporated an implicit finding that the resultant assessment was manifestly excessive"). Accordingly, "we conclude that the circumstances presented here do not rise to the level of the extraordinary situation that would warrant tax relief under the provisions of § 12-119." (Internal quotation marks omitted.) *Walgreen Eastern Co.* v. *West Hartford*, supra, 514.

The judgment is affirmed.

In this opinion the other justices concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker. Although Chief Justice Robinson was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

[1] General Statutes § 12-62 (b) provides: "(1) Commencing October 1, 2006, each town shall implement a revaluation not later than the first day of October that follows, by five years, the October first assessment date on which the town's previous revaluation became effective, provided, a town that opted to defer a revaluation, pursuant to section 12-62*l*, shall implement

a revaluation not later than the first day of October that follows, by five years, the October first assessment date on which the town's deferred revaluation became effective. The town shall use assessments derived from each such revaluation for the purpose of levying property taxes for the assessment year in which such revaluation is effective and for each assessment year that follows until the ensuing revaluation becomes effective.

"(2) When conducting a revaluation, an assessor shall use generally accepted mass appraisal methods which may include, but need not be limited to, the market sales comparison approach to value, the cost approach to value and the income approach to value. Prior to the completion of each revaluation, the assessor shall conduct a field review. Except in a town that has a single assessor, the members of the board of assessors shall approve, by majority vote, all valuations established for a revaluation.

"(3) An assessor, member of an assessor's staff or person designated by an assessor may, at any time, fully inspect any parcel of improved real property in order to ascertain or verify the accuracy of data listed on the assessor's property record for such parcel. Except as provided in subdivision (4) of this subsection, the assessor shall fully inspect each such parcel once in every ten assessment years, provided, if the full inspection of any such parcel occurred in an assessment year preceding that commencing October 1, 1996, the assessor shall fully inspect such parcel not later than the first day of October of 2009, and shall thereafter fully inspect such parcel in accordance with this section. Nothing in this subsection shall require the assessor to fully inspect all of a town's improved real property parcels in the same assessment year and in no case shall an assessor be required to fully inspect any such parcel more than once during every ten assessment years.

"(4) An assessor may, at any time during the period in which a full inspection of each improved parcel of real property is required, send a questionnaire to the owner of such parcel to (A) obtain information concerning the property's acquisition, and (B) obtain verification of the accuracy of data listed on the assessor's property record for such parcel. An assessor shall develop and institute a quality assurance program with respect to responses received to such questionnaires. If satisfied with the results of said program concerning such questionnaires, the assessor may fully inspect only those parcels of improved real property for which satisfactory verification of data listed on the assessor's property record has not been obtained and is otherwise unavailable. The full inspection requirement in subdivision (3) of this subsection shall not apply to any parcel of improved real property for which the assessor obtains satisfactory verification of data listed on the assessor's property record."

[2] The other original plaintiffs in the present case are Mary B. Tuohy, Robert Feery, Yola Feery, David W. Nickolenko, Sr., Charlene J. Nickolenko, James J. Falcone, Linda A. Falcone, Louise H. Fisher, and Betsey F. Amador. See also footnote 7 of this opinion.

[3] General Statutes § 12-119 provides: "When it is claimed that a tax has been laid on property not taxable in the town or city in whose tax list such property was set, or that a tax laid on property was computed on an assessment which, under all the circumstances, was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property, the owner thereof or any lessee thereof whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, prior to the payment of such tax, may, in addition to the other remedies provided by law, make application for relief to the superior court for the judicial district in which such town or city is situated. Such application may be made within one year from the date as of which the property was last evaluated for purposes of taxation and shall be served and returned in the same manner as is required in the case of a summons in a civil action, and the pendency of such application shall not suspend action upon the tax against the applicant. In all such actions, the Superior Court shall have power to grant such relief upon such terms and in such manner and form as to justice and equity appertains, and costs may be taxed at the discretion of the court. If such assessment is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes in accordance with the judgment of said court."

[4] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] Unless otherwise noted, all references herein to the trial court are to Judge Moll.

[6] "The town is divided into thirteen residential neighborhoods. The term 'neighborhood' is defined in the revaluation regulations as 'a geographic area of complementary real property parcels that share similar locational and market value characteristics, and may be defined by natural, man-made, or political boundaries . . . .' Regs., Conn. State Agencies § 12-62i-1 (13)."

[7] The trial court, *Cohn, J.*, granted the plaintiffs' motion for class certification to make them representatives of a class that includes "[a]ll owners of taxable residential real property with buildings thereon in . . . Groton Long Point . . . between October 1, 2011, and July 1, 2013, excluding those owners who individually appealed their real property tax assessments to the Superior Court and whose appeals have reached a final judgment."

[8] "With respect to [Groton Long Point], the land values were established using three vacant lot sales."

[9] "As part of this work, Tyler sent sales verification documents to the town to determine whether there were any unknown features within the validated sales set."

[10] "Christy has conducted sales ratio studies by neighborhood, in addition to townwide, in every revaluation she has handled."

[11] "An ASR results from the comparison between the assessed value that the CAMA program generates and the validated actual sale."

[12] "Christy even testified that, in her view, to adopt the 1.2 adjustment factor would have been unethical."

[13] "The [international association] is an international group that adopts standards that appraisers in revaluation use."

[14] We note that the trial court's memorandum of decision contains the following finding: "After changing the 1.2 factor to a 1.35 factor, Tyler did a 'field review' of all the values that resulted (*meaning they went out* and reviewed every property in [Groton Long Point] to ensure that the new computer generated values appeared to be full and fair market value for the whole sample)." (Emphasis added.) This finding is, however, inconsistent with the trial court's subsequent observation that, "at the time Tyler [and the] the town conducted the preliminary ratio tests that revealed a median ASR of 88.31 percent for [Groton Long Point], they were satisfied with the data collection concerning the [Groton Long Point] properties that had occurred over the [eighteen] month period prior thereto and believed that *there was no need to physically reinspect* each [Groton Long Point] property." (Emphasis added.) See footnote 18 of this opinion. We agree with the plaintiffs that the first finding on this point is clearly erroneous, in contrast to the second finding, which is supported by the record—namely, testimony from both Christy and Gardner indicating that no physical inspection of the subject properties was performed after Christy ran the various CAMA scenarios and changed the adjustment factor from 1.2 to 1.35.

[15] "The parties stipulated that, had the town applied a 1.0 factor to [Groton Long Point], the resulting residential property class values would have passed the ratio testing standards set forth in the OPM regulations."

[16] The trial court, *Miller, J.*, previously had denied the parties' motions for summary judgment, concluding that the "opinions of dueling appraisal experts" presented a genuine issue of material fact with respect to the manifest excessiveness of the assessments and whether the application of the 1.35 factor to all of the properties in Groton Long Point disregarded statutory requirements to "determine the true and actual valuation of each individual property . . . ."

[17] OPM promulgated this regulation pursuant to General Statutes § 12-62 (g), which provides: "The secretary shall adopt regulations, in accordance with the provisions of chapter 54, which an assessor shall use when conducting a revaluation. Such regulations shall include (1) provisions governing the management of the revaluation process, including, but not limited to, the method of compiling and maintaining property records, documenting the assessment year during which a full inspection of each parcel of improved real property occurs, and the method of determining real property sales data in support of the mass appraisal process, and (2) provisions establishing criteria for measuring the level and uniformity of assessments generated from a revaluation, provided such criteria shall be applicable to different classes of real property with respect to which a sufficient number of property sales exist. Certification of compliance with not less than one of said regulatory provisions shall be required for each revaluation and the assessor shall, not later than the date on which the grand list reflecting assessments of real property derived from a revaluation is signed, certify to the secretary and the chief executive officer, in writing, that the revaluation was conducted in accordance with said regulatory requirement. Any town effecting a revalu-

ation with respect to which an assessor is unable to certify such compliance shall be subject to the penalty provided in subsection (d) of this section. In the event the assessor designates a revaluation company to perform mass appraisal valuation or field review functions with respect to a revaluation, the assessor and the employee of said company responsible for such function or functions shall jointly sign such certification. The assessor shall retain a copy of such certification and any data in support thereof in the assessor's office. The provisions of subsection (c) of this section concerning the public inspection of criteria, guidelines, price schedules or statement of procedures used in a revaluation shall be applicable to such certification and supporting data."

[18] The trial court emphasized that the plaintiffs and their expert witness had failed to cite any statute or regulation requiring such reinspection, and credited Christy's testimony that the defendants were "satisfied with the data collection concerning the [Groton Long Point] properties that had occurred over the [eighteen] month period prior thereto and believed that there was no need to physically reinspect each [Groton Long Point] residential property."

[19] The plaintiffs also posit that, to the extent that adjustment was required because of Groton Long Point's "unique" features and amenities, § 12-62 required the defendants to conduct individual assessments, particularly because access to the amenities runs with the land, and the defendants adjusted the value of the improvements, rather than the land.

[20] "In *Second Stone Ridge Cooperative Corp.* v. *Bridgeport*, 220 Conn. 335, 339, 597 A.2d 326 (1991), we explained the distinction between municipal tax appeals brought pursuant to § 12-119 and those authorized by General Statutes § 12-117a, formerly codified at General Statutes § 12-118. While the latter statute provide[s] a method by which an owner of property may directly call in question the valuation placed by assessors upon his property by an appeal to the board of [tax relief], and from it to the courts . . . § 12-119 allows a taxpayer to claim either that a town lacked authority to tax the subject property, or that the assessment was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of [the real] property . . . . In short, § 12-117a is concerned with overvaluation, while [t]he focus of § 12-119 is whether the assessment is illegal." (Citations omitted; internal quotation marks omitted.) *Griswold Airport, Inc.* v. *Madison*, 289 Conn. 723, 740, 961 A.2d 338 (2008).

[21] The Uniform Standards of Professional Appraisal Practice was admitted into evidence at trial as plaintiffs' exhibit 17. We also note that the relevant portions of this publication were reproduced in part II of the plaintiffs' appendix to their brief filed in this appeal.

[22] The Fundamentals of Mass Appraisal and the Standard on Ratio Studies were admitted into evidence, respectively, as defendants' exhibit 609 and plaintiffs' exhibit 16. We note that certain relevant portions of these publications were also reproduced in the appendices to the briefs submitted by the parties in this appeal.

[23] The Fundamentals observe that "[r]atio studies measure two primary aspects of mass appraisal accuracy: level of valuation and uniformity of values. *Appraisal level* refers to the overall, or typical, ratio at which properties are appraised relative to market value. In mass appraisal, appraised values should not be expected always to equal independent indicators of market value (sale prices or independent appraisals), but high and low ratios should balance, so that the typical ratio is near 100 percent." (Emphasis in original.) Fundamentals of Mass Appraisal, supra, p. 198. In contrast, "[a]ppraisal uniformity relates to the extent to which appraisal procedures produce logical and consistent results across individual properties. Uniformity requires, first, that properties be appraised equitably within groups or categories (use classes, neighborhoods, and so forth); that is, how close are the individual ratios to the typical ratio (appraisal level)? Second, each group of properties should be appraised at approximately the same level or percentage of market value. In sum, appraisal uniformity requires equity *within* groups and *between* groups." Id. (Emphasis in original.)

[24] "Direct equalization involves use of adjustment factors, which produce effects mathematically identical to those derived through the application of 'trending' or 'index' factors, which are commonly used for value updating by local assessing jurisdictions. The most significant differences typically are the level of the jurisdiction originating the adjustments and the stratification of property to which the factors are applied. Local jurisdictions with primary assessment responsibility can develop value adjustment factors as

an interim step between complete reappraisals. Such factors commonly are applied to properties by property type, location, size, age and other characteristics . . . . It is rare for equalization factors developed by oversight agencies to be applied to strata more specific than property class or broad geographic area. Often such factors are applied [jurisdiction wide]." (Citation omitted.) Standard on Ratio Studies, supra, p. 21.

[25] In contrast to direct equalization, "[w]hen indirect equalization is used, appraisals are not adjusted. Instead, indirect equalization involves an oversight agency estimating total taxable value, given the legally required level of assessment or market value. Indirect equalization allows proper distribution of intergovernmental transfer payments between state or provincial and local governments despite different levels of appraisal among jurisdictions or property classes." Standard on Ratio Studies, supra, p. 21.

[26] The international association's standards provide, for example, that "assuming that all classes of property are to be assessed at 100 [percent] of market value, without such equalization, in a case [in which] residential property is assessed at a median of 80 [percent] of market value, while commercial property is assessed at a median of 90 [percent] of market value, residential property will pay 80 [percent] of its proper tax share and commercial property will pay 90 [percent] of its proper tax share. Other classes that may be assessed at 100 [percent] will pay more than their proper tax shares. Direct equalization mitigates this problem. However, such equalization cannot improve uniformity between properties within a given stratum. So, in the previous example, the median level of assessment for residential property can be adjusted from 80 [percent] to 100 [percent] of market value, assessment disparities between individual residential properties will not be addressed. For this reason, reappraisal orders should be considered as the primary corrective tool for uniformity problems, and direct equalization should be considered appropriate only if time or other constraints preclude such an approach." Standard on Ratio Studies, supra, p. 22.

[27] The court also observed that the assessor's study itself revealed a wide variety of undervaluation, from 28 to 45 percent, making it "clear that the application of the 28 percent factor would not reflect the value of a particular property based upon its individual characteristics as the statutes require. Even for properties falling within the normal range of undervaluation, there would be a substantial disproportion in the tax burden imposed on those at the lower part of the range, which presumably would carry their full share by application of the 28 percent factor, and those at the higher part of the range which would not." *Chamber of Commerce of Greater Waterbury, Inc.* v. *Waterbury*, supra, 184 Conn. 338.

[28] We note that the court rejected Waterbury's argument that "even after the application of the fixed percentage increase each of the affected properties has been valued at a figure not exceeding its fair market value." *Chamber of Commerce of Greater Waterbury, Inc.* v. *Waterbury*, supra, 184 Conn. 336. The court stated that "valuation of property in excess of fair market value is not the only ground upon which a taxpayer may be entitled to relief. . . . Any circumstances indicating that a disproportionate share of the tax burden is being thrust upon a taxpayer would warrant judicial intervention. . . . The plaintiffs claim that an illegal method of establishing assessments for their properties has been followed, which has not been applied to other taxpayers. If the challenged procedure is illegal, the plaintiffs must prevail." (Citations omitted.) Id. *Chamber of Commerce of Greater Waterbury, Inc.*, is not expressly a § 12-119 case, and does not even cite that statute. As such, this portion of the analysis in that case is inconsistent with the well established conjunctive test governing § 12-119, which requires proof of both an illegal assessment and that the valuation is manifestly excessive. See, e.g., *Walgreen Eastern Co.* v. *West Hartford*, supra, 329 Conn. 513–14.

[29] Accordingly, we also find distinguishable the Superior Court cases on which the plaintiffs rely, both of which were not mass appraisal cases conducted under the international association's standards. See *Rand-Whitney Containerboard L.P.* v. *Montville*, Superior Court, judicial district of New London, Docket No. CV-01-0559167-S (October 30, 2006) (application of lower depreciation rate solely to plaintiff's property and no other taxpayers); *Yankee Gas Co.* v. *Meriden*, Superior Court, judicial district of Tolland, Complex Litigation Docket, Docket No. X07-CV-96-0072560-S (April 20, 2001) (29 Conn. L. Rptr. 285, 291) (creation of unique methodology aimed solely at plaintiff's property was equal protection violation actionable under § 12-119).

[30] We emphasize that our analysis in this appeal is limited to the legality of the mass appraisal methodology and does not determine the validity of any

individual property owners' claims of overassessment pursuant to General Statutes § 12-117a as a result of the application of an adjustment factor during direct equalization. See footnote 20 of this opinion.

———————————————